```
                                                    FILED
                                               U.S. DISTRICT COURT
  IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
                       CENTRAL DIVISION         2007 NOV -5 P 2:28
                                               DISTRICT OF UTAH
                                               BY:_____
                                                    DEPUTY CLERK
```

| | |
|---|---|
| RANDY THOMAS NAVES,<br><br>    Plaintiff,<br><br>v.<br><br>WIL CARLSON et al.,<br><br>    Defendants. | Case No. 2:06-CV-658 DB<br><br>**MEMORANDUM DECISION AND**<br>~~SCREENING~~ **ORDER DISMISSING**<br>**COMPLAINT** |

Plaintiff, Randy Thomas Naves, an inmate at the Utah State Prison, filed this pro se civil rights suit under 42 U.S.C. § 1983. Plaintiff was granted leave to proceed *in forma pauperis* under 28 U.S.C. § 1915. This case is now before the Court for screening of the Complaint under 28 U.S.C. § 1915(e).

## ANALYSIS

### I. Screening Standard of Review

Under 28 U.S.C. § 1915(e)(2)(B), a court shall dismiss any claims in a complaint filed *in forma pauperis* if they are frivolous, malicious or fail to state a claim upon which relief may be granted. "Dismissal of a pro se complaint for failure to state a claim is proper only where it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend." Perkins v. Kan.

Dep't of Corr., 165 F.3d 803, 806 (10th Cir. 1999). When reviewing the sufficiency of a complaint the Court "presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." Hall v. Bellmon, 935 F.2d 1106, 1109 (10th Cir. 1991).

Because Plaintiff is proceeding pro se, the Court must construe his pleadings liberally and hold them to a less stringent standard than formal pleadings drafted by lawyers. Id. However, "[t]he broad reading of the plaintiff's complaint does not relieve [him] of the burden of alleging sufficient facts on which a recognized legal claim could be based." Id. at 1110. While Plaintiff need not describe every fact in specific detail, "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." Id. at 1110.

## II. Plaintiff's Allegations

Plaintiff's Complaint alleges infringement of the right to freely exercise his religion under the First Amendment. It also asserts a claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C.A. § 2000cc-1 to 3 (2000). Plaintiff's complaint is essentially narrative in form, making it difficult to decipher his exact claims and the specific facts supporting them. However, the essence of his claims appears to be that Defendants confiscated certain

religious writings and books from him and improperly questioned him about his religious beliefs.[1]

Plaintiff's Complaint stems from an investigation led by Defendant Carlson into a computer disk found hidden inside a wall in one of the dorms of the Oquirrh Five housing unit.  The disk apparently contained stories describing adults having sexual relations with underage girls.  It also contained a copy of a manuscript attributed to Plaintiff, entitled "Institutional Book of Shadows."  Plaintiff admits compiling the original version of this text and describes it as "essentially [a] Prayer Book[] for [his] religion."  (Compl. ¶15.)

At the time the disk was discovered Plaintiff was employed as a clerk and phone operator in the Utah Corrections Industries (UCI) data entry shop.  Based on the disk's contents Carlson approached Plaintiff at UCI to determine whether the disk belonged to Plaintiff.  Plaintiff initially denied any connection with the disk or its contents, pointing out that it was not found in his dorm unit.  Although Plaintiff admitted original authorship of the "Institutional Book of Shadows," he argued that

---

[1] Plaintiff does not specifically identify his religion in his complaint.  However, it appears that he is an adherent of Wicca, which "is a polytheistic faith based on beliefs that prevailed in both the Old World and the New World before Christianity. Its practices include the use of herbal magic and benign witchcraft." O'Bryan v. Bureau of Prisons, 349 F.3d 399, 400 (7th Cir. 2003) (internal quotation omitted).

the version found on the disk could not be attributed to him because the pagination was different from a printed version which he showed to Carlson. Plaintiff stated that the disk belonged to another inmate but refused to identify that individual. Despite Plaintiff's denials regarding the disk, it became clear from Carlson's investigation that Plaintiff had misused UCI facilities to produce paper copies of his manuscripts.[2] Based on this determination Carlson told Plaintiff that he was being terminated from his job at UCI and that he must clean out his desk immediately.

After gathering his belongings, Plaintiff was initially escorted to the Oquirrh library and asked to identify the computers he used to produce his manuscripts, as well as the computers used by the library inmate clerks.[3] A search of the area around the clerks' computers turned up contraband books on Wicca from outside the library system bearing another inmate's name and number. That inmate was also rounded up for questioning. Plaintiff was then taken to the barrier visit room. While there, Plaintiff was informed that a subsequent search of

---

[2] Plaintiff admits that he "occassionally [sic] used the office copier to duplicate [his] Book of Shadows when [he] needed them for other members of [his] faith . . . though [his] supervisor had never caught [him] at it." (Compl. ¶ 17.)

[3] It appears that one of the library inmate clerks was also suspected of being involved with the contraband computer disk.

his desk, conducted by his UCI supervisor, turned up hard-copies of the same sexually explicit writings found on the disk discovered in Oquirrh Five.

Some time later, Plaintiff was escorted to his cell and told to collect all his property so that it could be inventoried in preparation for his transfer to maximum security. Plaintiff was returned to the barrier visiting room while officers went through his property. Plaintiff was later brought to the Oquirrh Five office where he received a clear plastic bag containing the items he would be allowed to retain in maximum security. Plaintiff was also shown the remainder of his property which he was told would be sent to the property room for further disposition. Plaintiff was finally taken to a lock-down unit in the Oquirrh Three facility where he remained during the ongoing investigation.

The following day, Plaintiff was escorted to Captain Carlson's office, where Defendant Elliott and Defendant Dirk[4] were also present. Carlson showed Plaintiff several bags into which had been sorted the items that Plaintiff was prohibited from taking with him to Oquirrh Three. Plaintiff was informed that some of the items were being confiscated as contraband[5] and

---

[4] Plaintiff's complaint identifies this individual only by is first name, Dirk. His surname has yet to be established.

[5] Chief among the confiscated items were Plaintiff's manuscripts, which were deemed "nuisance contraband" based on their descriptions of sexual acts involving minors, and the fact

the remainder were being placed on disposition with the property department, due to Plaintiff's more restrictive housing assignment.  Among the items Plaintiff was prohibited from taking to his new cell were two religious books: "The Good Witches Bible," by Gavin and Yvonne Frost, and "Wicca: A Guide for the Solitary Practitioner," by Scott Cunningham.[6]  It appears from grievance records attached to the complaint that these books were not confiscated as contraband but were sent to the property room for disposition.  (Compl. Ex. B at 9.)  Although it is unclear what became of these books, Plaintiff states that he was later able to replace both of them, albeit at his own expense.[7]

After discussing the status of Plaintiff's property, Carlson began to question Plaintiff further about his use of library resources, and about the writings found on the disk.  This line of questioning led to some discussion about Plaintiff's religious beliefs, including the practice of "ritual nudity" and "sex and fertility rites."  (Compl. ¶ 31.)  Plaintiff was allegedly asked

---

that they were produced without authorization using prison resources.  (Compl. Ex. B at 9.)

[6] Plaintiff states that he had previously been forced to send a third book, "The Complete Witches Bible," by Janet and Stewart Ferrar, out of the prison because it contained nudity, and because Plaintiff had exceeded his allowance of ten books.

[7] Plaintiff states that he has been unable to replace one book, entitled "The Dead Frog is Mine," by Gavin and Yvonne Frost, because it is out of print.

to identify other inmates in the unit who practiced Wicca with Plaintiff, and whether he knew another inmate who had been found in possession of tarot cards. Plaintiff alleges that Defendants questioned the appropriateness of Plaintiff's writings based on his stated religious views, and in light of his status as a convicted sex offender.[8]

Based on Carlson's investigation, formal disciplinary proceedings were commenced against Plaintiff. The hearing officer, Shelby Herbert, found "some evidence" to support the conclusion that "[Plaintiff] used the Department computer in the Oquirrh library to write stories depicting graphic sexual relations between adults and children." (Compl. Ex. H at 1.) Plaintiff was found guilty of "Unauthorized Possession or Use of Computer Equipment" and assessed a fine of $50. Plaintiff was also reclassified a "severe management problem" and transferred to maximum security, where he remained for over a year. Plaintiff states that his job in maximum security paid less than his former UCI position and that since leaving maximum security he has been unable to work for pay.

Plaintiff's Complaint seeks compensation for the loss of his

---

[8] Plaintiff states that Dirk specifically questioned the appropriateness of several excerpts from one of Plaintiff's writings entitled "The Storyteller Trilogy." This manuscript was also confiscated as contraband and is described as "a collection of short stories." (Compl. Ex. C at 4.)

property and income, and punitive damages for the alleged violation of his right to freely practice his religion. Plaintiff also seeks an injunction prohibiting Defendants from confiscating his religions materials in the future.  Finally, Plaintiff requests that the Court create an "independent civilian panel" to review prison determinations regarding access to religious materials.

### III. Legal Standard for Prisoner Free Exercise Claims

It is well established that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." Bell v. Wolfish, 441 U.S. 520, 545, 99 S. Ct. 1861, 1877 (1979).  "The Free Exercise Clause mandates that prison authorities afford prisoners reasonable opportunities to exercise their sincerely held religious beliefs." Hammons v. Saffle, 348 F.3d 1250, 1254 (10th Cir. 2003) (citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S. Ct. 2400, 2404 (1987)).  However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Bell, 441 U.S. at 546.  Thus, under the First Amendment, prison officials may restrict inmates' religious practices to accomplish the goals of "maintaining institutional security and preserving internal discipline," id. at 546, so long as the restrictions are

"rationally related to legitimate penological interests." <u>Turner v. Safley</u>, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987). The *Turner* Court identified four factors relevant to the constitutionality of a prison's restrictions on religion: (1) whether a valid, rational connection exists between the regulation and the government interest it protects; (2) whether prisoners have alternative means of exercising the protected right; (3) the impact of accommodating the right on other inmates, guards, and the allocation of prison resources generally; and (4) whether alternatives exist that fully accommodate the prisoner's rights at de minimis cost to valid penological interests. <u>Turner</u>, 482 U.S. at 89-90.

### IV. Sufficiency of Plaintiff's Allegations under the First Amendment

Plaintiff's complaint challenges two separate aspects of Defendants actions: first, the confiscation of Plaintiff's religious books and writings; and, second, Defendants' alleged interrogation of Plaintiff regarding his religious beliefs and practices. Plaintiff asserts that each of these actions violated his right to freely exercise his religion.

### A. Confiscation of Religious Materials

Plaintiff's Complaint does not support the conclusion that Defendants violated Plaintiff's free-exercise rights by confiscating his religious books and writings. To the contrary,

Plaintiff's Complaint and attached exhibits clearly show that the confiscation of these materials was rationally related to legitimate penological objectives.

### 1. Manuscripts and Personal Writings

Regarding Plaintiff's manuscripts and personal writings, the record shows that these items were not confiscated because of their religious content, but because they were produced using misappropriated prison resources. Plaintiff admits that the manuscripts were printed on paper taken from the prison and were produced without authorization using prison equipment. Thus, despite their alleged religious content the materials were clearly subject to confiscation as contraband. See <u>Gardner v. Johnson</u>, 429 F. Supp. 432, 433-34 (E.D. Mich 1977).

Analysis of the four *Turner* factors strongly supports the prison's policy of confiscating such contraband regardless of its religious content. First, the policy is obviously rationally related to the legitimate goal of discouraging inmates from misappropriating prison resources. Second, the policy does not prohibit inmates from obtaining or producing such materials through approved means. Third, allowing inmates to retain such contraband would undoubtedly burden prison resources by encouraging further misappropriation of prison property. It would also seriously threaten prison security by inhibiting prison efforts to monitor inmate property and recover purloined

prison property. And, finally, the Court can conceive of no alternative to confiscation that would allow inmates to retain such contraband with only de minimis impact on penological objectives.

Thus, the Court concludes that Plaintiff's allegations regarding the confiscation of his illicitly produced manuscripts do not support a Free Exercise claim under *Turner*.

### 2. Religious Books

Plaintiff's Complaint and attached exhibits show that the confiscation of Plaintiff religious books did not violate his First Amendment right to freely exercise his religion. Even assuming that these books were used in Plaintiff's religious practice, Plaintiff has not alleged any facts showing that the books were banned under prison regulations or that he was prohibited from retaining these books because of their religious content. Instead, the record shows that these books were placed on disposition as a matter of routine following Plaintiff's transfer to maximum security, and, that Plaintiff was allowed to reacquire these books once his security level was reduced.[9]

---

[9] It is unclear what happened to Plaintiff's books after they were placed on disposition. However, even if they were disposed of by the property department in violation of prison policies, such a deprivation would not give rise to a constitutional due process claim if an adequate state post-deprivation remedy was available. Plaintiff does not allege that such remedies were unavailable. See Hudson v. Palmer, 468 U.S. 517, 104 S. Ct. 3194 (1984).

Given the ample justification in the record for Plaintiff's reclassification and housing reassignment--namely, Plaintiff's admitted misuse of prison property--Plaintiff's allegations do not support the conclusion that his transfer to maximum security, or the concomitant reduction in privileges, was motivated by religious bias.  Moreover, Plaintiff does not dispute that the heightened restrictions on personal property, including religious books, imposed on maximum security inmates are rationally related to legitimate penological objectives.

Thus, the Court concludes that Plaintiff's allegations regarding the disposition of his books during his confinement in maximum security are insufficient to state a First Amendment claim.

### B. Religious Questioning

The Court now turns to the question whether Defendants' alleged interrogation of Plaintiff regarding his religious beliefs significantly infringed Plaintiff's right to freely exercise his religion.  The facts alleged in the Complaint, as well as the attached supporting documentation, show that the questioning occurred in the context of an investigation into the origin of the contraband computer disk  and Plaintiff's suspected misappropriation of prison property.  According to the Complaint, the disk  contained a copy of Plaintiff's "Institutional Book of Shadows," albeit with allegedly altered pagination, as well as

other writings describing adults having sexual relations with minors. It is undisputed that Defendants had a legitimate interest in identifying the owner of the disk. Moreover, given its contents, it was not unreasonable for Defendants to suspect that Plaintiff might somehow be linked to the disk. Thus, the facts alleged in the complaint do not support the conclusion that Plaintiff was unfairly targeted for investigation because of his religion, or that the questioning was motivated by religious bias. Instead, the complaint shows that the questioning was motivated by a legitimate interest in investigating suspected violations of prison regulations banning sexually explicit material.

Plaintiff's description of the conversation in which the religious questions arose also shows that Defendants' questions were focused, not on Plaintiff's religious beliefs as such, but on their possible connection to the sexually explicit writings under investigation. Plaintiff states:

> In trying to point out the many ways Wicca is practiced, I stated some Wiccan groups practice ritual nudity; others do not. Some practice sex and fertility rites; others do not. During discussion of fertility rites, Officer Dirk along with Captain Wil Carlson, repeatedly tried to get me to state a specific age when these would occur. I answered variations on: When the creator decides you're ready; when a girl has her first period, or a boy discovers his plumbing works . . . .

(Compl. at ¶ 31 to 32.) Rather than showing any "interrogation"

of Plaintiff regarding his religion, this description shows that Plaintiff voluntarily discussed his religion in response to questions about the nature of the sexually explicit writings under investigation.

Finally, Plaintiff offers no support for his assertion that an official's discussion of religion with an inmate, for any reason whatsoever, violates the First Amendment. While allegations of repeated questioning without any legitimate motive might support a claim of religious discrimination, Plaintiff makes no such allegations here. Instead, Plaintiff merely alleges that the subject of religion came up during Defendants' investigation into Plaintiff's illicit activities, and that Plaintiff voluntarily discussed his religious beliefs as they related to his writings. There is no indication that this discussion significantly impinged upon Plaintiff's religious activities.

Thus, the Court concludes that Plaintiff's allegation that he was questioned regarding his religious views fails to state a claim for relief under the First Amendment.

### V. Religious Land Use and Institutionalized Persons Act

Plaintiff's Complaint also asserts a cause of action under the Religious Land Use and Institutionalized Persons Act (RLUIPA). 42 U.S.C. § 2000cc (2000). RLUIPA requires strict scrutiny of correctional regulations that infringe upon inmates'

religious practices. Under section 3 of RLUIPA, a prison is forbidden from "impos[ing] a substantial burden on the religious exercise" of an inmate "unless [it] demonstrates that imposition of the burden on that person . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).

Under RLUIPA, the plaintiff bears the initial burden of demonstrating that the prohibited activity is a religious exercise and that the defendant substantially burdened that exercise. See 42 U.S.C. § 2000cc-1. RLUIPA defines religious exercise to "include[ ] any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Although "substantial burden" is not defined in RLUIPA, see 42 U.S.C. § 2000cc-5, the Tenth Circuit has concluded that "RLUIPA's legislative history reveals that 'substantial burden' is to be interpreted by reference to the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb et seq., and First Amendment jurisprudence." Grace United Methodist Church v. City of Cheyenne, 427 F.3d 775, 794-95 (10th Cir. 2005) (citations omitted). Under Supreme Court precedent, a substantial burden occurs when a state "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs," Thomas v. Review Bd. of Ind. Employment Sec. Div., 450

U.S. 707, 718, 101 S. Ct. 1425 (1981), or when a person is required to "choose between following the precepts of her religion and forfeiting [] benefits, on the one hand, and abandoning the precepts of her religion . . . on the other." Sherbert v. Verner, 374 U.S. 398, 404, 83 S. Ct. 1790 (1963). However, "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs" do not fall within these parameters. Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 450-51, 108 S. Ct. 1319 (1988).

### A. Confiscation of Religious Books and Writings

As an initial matter, Plaintiff's allegations do not support the conclusion that the confiscation of his books and manuscripts imposed a substantial burden on his religious exercise. Regarding the books, Plaintiff does not assert that they were used in his religious worship or that he was unable to meaningfully practice his religion without them. Regarding the manuscripts, although Plaintiff describes his "Institutional Book of Shadows," as "essentially [a] Prayer Book[] for [his] religion," he also states that the manuscript was essentially just a compilation of excerpts taken from various books about Wicca. There is no indication that the manuscript played a significant role in Plaintiff's routine worship, or that the

temporary loss of the manuscript inhibited Plaintiff from practicing his religion in any meaningful way.[10]

More importantly, even if confiscation of the books and writings substantially burdened Plaintiff's religious practice, the Complaint shows that confiscation was the least restrictive means of furthering a compelling governmental interest. Given Plaintiff's admission that the manuscripts were contraband, and that the books were merely placed on disposition as a result of Plaintiff's reassignment to maximum security, there can be little doubt that Defendants' alleged actions here would satisfy even the strict scrutiny required under RLUIPA. The prison's policy of immediately confiscating misappropriated prison property, regardless of how it is put to use by an inmate, is the only conceivable means by which prison officials can ensure security and preserve scarce prison resources. Moreover, the prison's policy of limiting the amount of personal property, including books, retained by maximum security inmates is necessary to the prison's compelling interest in heightened security for inmates who present severe management problems. Any less restrictive alternatives, assuming they exist, would undoubtedly undermine compelling governmental interests in maintaining security and

---

[10] It appears that Plaintiff was only temporarily deprived of his "Institutional Book of Shadows" based on the fact that he included a copy of that manuscript with his Complaint. (Compl. Ex. L.)

controlling costs.

Thus, the Court concludes that Plaintiff's allegations regarding the confiscation of his books and manuscripts are insufficient to state a claim under RLUIPA.

### B. Religious Questioning

Plaintiff's allegations regarding the religious questioning he underwent as part of the investigation into the contraband computer disk also fail to state a claim under RLUIPA's strict scrutiny standard. As previously noted, Plaintiff's complaint does not show that the questioning substantially burdened Plaintiff's religious exercise in any way. In fact, the Complaint shows that the discussion of Plaintiff's religious views was voluntary, was not motivated by any discernable religious bias, and was part of a valid investigation into the origin of contraband linked to Plaintiff. Moreover, Plaintiff does not allege any facts showing that as a result of this questioning he was coerced into acting contrary to his religious beliefs. Instead, it appears that the discussion allowed Plaintiff an opportunity to further educate prison staff about his religious views and practices, particularly as they related to the contraband under investigation. Far from substantially burdening Plaintiff religious exercise, this exchange might have helped insure that Plaintiff's religious exercise would not be unnecessarily burdened.

Because the facts show that the questioning regarding Plaintiff's religious beliefs did not impose a substantial burden on his religious exercise the Court need not address whether the questioning was the least restrictive means of pursuing a compelling governmental interest.  Thus, the Court concludes that Plaintiff's allegations regarding Defendants' inquiries regarding Plaintiff's religious beliefs are insufficient to state a claim for relief under RLUIPA.

### ORDER

Based on the foregoing analysis, **IT IS HEREBY ORDERED** that Plaintiff's Complaint is **DISMISSED** under 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim on which relief can be granted.

DATED this 5th day of November, ~~October,~~ 2007.

BY THE COURT:

_____
Dee Benson
United States District Judge